## OLIN INDUSTRIES, Inc., v. BARNETT et al.

### Civil Action No. 618.

District Court, S. D. Illinois, S. D.
Jan. 24, 1946.

Bryan, Cave, McPheeters & McRoberts, of St. Louis, Mo., for plaintiff.

Herbert S. Thatcher, of Washington, D. C., for defendants (non-veterans) and American Federation of Labor.

Schaefer O'Neill, of Alton, Ill., for defendants (veterans).

BRIGGLE, District Judge.

This is a suit for declaratory judgment, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C.A. § 400, and the questions presented arise under Section 8 (a, b, c) of the Selective Training and Service Act of 1940, as amended, 50 U.S. C.A.Appendix, § 308(a, b, c).* The purpose of the suit is to have the Court determine and declare the rights of various employees and classes of employees of the plaintiff.

Olin Industries, Inc. (formerly Western Cartridge Company), is engaged in the business of producing various forms of explosive materials and maintains a plant at East Alton, Illinois. On July 28, 1943, plaintiff entered into a certain collective bargaining agreement with the American Federation of Labor and affiliated organizations, which had theretofore been designated as the bargaining agents for all production and maintenance employees of plaintiff at the East Alton plant with respect to rates of pay, wages, hours of employment and other conditions. Thereafter this agreement was modified and extended from time to time by other written

---

* "(a) Any person inducted into the land or naval forces under this Act for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training and service under section 3(b) (section 303(b) of this Appendix) shall be entitled to a certificate to that effect * * *.

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within forty days after he is relieved from such training and service— * * *

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; * * *.

"(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of active military service, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was ordered into such service, and shall not be discharged from such position without cause within one year after such restoration. * * * "

agreements, and as so modified and extended was in full force and effect at the times pertinent for our consideration. It is unnecessary to recite at length the terms of these bargaining agreements, but it is sufficient for our purpose to note that they each provide in great detail for the principle of service seniority in all dealings between the employer and employees. The contract, not unlike usual labor agreements, provides among other things, as follows:

"Section 1: The principle of length of service seniority shall be adhered to .for employees covered by this agreement with respect to promotions, demotions, transfers, layoffs and re-employment, in the plant, as long as the employees affected have approximately equal ability required to do the job in question and perform their work in a safe and efficient manner. Any employee taking any position must possess the preliminary knowledge and training, together with the ability and physical fitness necessary to qualify for that position as determined by the management.

"Section 2: After completing a 90-day probationary period, an employee's length of service seniority shall begin and accumulate from the most recent date of service with the Company. Within thirty (30) days after the signing of this working agreement, the Company shall furnish the Union a Seniority list compiled·on the basis of length of service only.

"Section 3: When length of service seniority is to be the determining factor, it shall be measured by the length of plant-wide employment but shall be applied on a job classification or occupational group basis. In the event of layoffs, employees who have been laid off from any job classification or occupational group may be transferred at the discretion of the Company in accordance with their plant-wide seniority to any other job classification or occupational group for which they· are qualified. When an employee is transferred from one job classification or occupational group to another for any reason, there shall be no loss of length of service seniority. After an employee has worked in any job classification·or occupational group for a total of thirteen (13) weeks, he is then considered a member of that occupational group, and assumes his position on the seniority list of such group in accordance with his plant wide seniority, *  *·  *"

The contract also takes into consideration the provisions of the Selective Training and Service Act and undertakes to harmonize the collective bargaining agreement with the pertinent· terms of the Act, as follows:

"Section 1: Any employee who is called into active service, or who in time of· war volunteers, in the military forces or the Merchant Marine of the United States, shall be given a leave of absence for, and will accumulate Seniority during, such period of service. Upon termination of such service, he will be re-employed provided he has not been dishonorably discharged and provided such employee has not voluntarily re-entered such service after being offered an opportunity of demobilization, and is physically and mentally able to do available work in line with his seniority, at the current rate for such work, and provided he reports for work within 40 (now 90) days of the date of such discharge, unless circumstances have so changed as to make it impossible or unreasonable for the Company to do so."

The complaint shows that prior to the outbreak of World War II and particularly during the years 1935 to 1939, inclusive, plaintiff employed at its East Alton plant a maximum of 2979 persons and an average of 2333; that following the outbreak of World War II plaintiff greatly expanded its operations at the East Alton plant until it had a maximum of 11926 employees in 1943. Since the end of hostilities employment at the plant has been markedly reduced until September ·21, 1945, there were 4369 employees. During the period from May 1, 1940, to October 1, 1945, 3459 of plaintiff's employees left their positions at the · plant to enter the military service of the United States, many of whom are now returning and demanding reemployment by plaintiff under the terms of the Selective Training and Service Act heretofore referred to. All defendants have entered their appearance herein and admitted all the allegations of fact contained in the complaint. One group (non-military service) asserting, however, that upon those facts they are entitled to retain their present positions with the company; the other group of defendants (those of military service) asserting that upon the agreed facts and under the provisions of the Selective Training and Service Act they are entitled to be re-employed by the plaintiff and if necessary to replace

defendant-employees of non-military service.

Four several cases are presented by the complaint in which the employer is confronted with the demand of two separate individuals for the same position.

### Case No. 1, Barnett-Hinderhan.

Defendant Joseph Barnett was employed by plaintiff on May 23, 1933, and was promoted to the position of caster on May 6, 1940, and has since held and now holds such position. Defendant Eugene Hinderhan was employed by plaintiff on May 27, 1940, and was promoted to the position of caster on January 18, 1942, which position he held until September 16, 1942, when he left to enter the military service of the United States. Hinderhan was honorably discharged from the armed forces on October 3, 1945, received the certificate referred to in Section 8(a) of the Act, was qualified to perform the duties of a caster and made application for reemployment with plaintiff within the time required by the Act. At the time Hinderhan made application for reemployment, defendant Barnett had the shortest service seniority of any caster then employed by plaintiff who had not been in the military service, and if plaintiff is required under the Act to reemploy Hinderhan as caster it will be necessary for plaintiff to remove Barnett from his position as a caster and either demote him or discharge him. Defendant Hinderhan asserts that under the provisions of the Selective Training and Service Act he is entitled to be reemployed as a caster regardless of his length of service seniority in the plaintiff's plant and regardless of whom it might displace. Defendant Barnett asserts that under the provisions of the collective bargaining agreement between plaintiff and employees that he is entitled to the position of caster instead of the defendant Hinderhan, not by reason of military service, but by reason of greater service seniority in plaintiff's plant, and this in spite of the provisions of the Selective Training and Service Act.

During the years 1935 to 1939 inclusive, plaintiff employed at its plant an average of 30 casters, but as a result of plaintiff's expansion following the outbreak of World War II plaintiff employed a maximum of 100 casters. Since the close of the war, and as a result of the reduction in operations plaintiff now employs only 24 casters all of which positions are filled by persons long in the employ of plaintiff, but without military service in the second world war, and all of whom have greater length of service seniority than defendant Hinderhan. We thus have the case of Barnett, a non-military service employee who has worked in plaintiff's plant since 1933 and has worked as a caster since May 6, 1940; and the case of Hinderhan who began working for plaintiff on May 29, 1940, and became a caster on January 18, 1942, and left for military service in September, 1942. The pleaded and admitted facts disclose that plaintiff's operations began to reflect the impact of war orders in 1939, and during the ensuing war years, the number of plaintiff's employees jumped from a previous high of 2979 to a maximum of 11926 and on September 21, 1945, following the end of hostilities, the number of employees had then been reduced to 4369. It further appears that during the war years 3459 persons who were employed at plaintiff's plant at various times left in order to perform military service, many of whom are now returning to reclaim their positions. Hinderhan is one of the 3459. It is a reasonable inference that a very large percentage of those leaving the plant to enter military service came from among those employed after the war started, as the older employees, many of whom have been with plaintiff 10, 20, or 30 years, obviously would not be of military age. Plaintiff's normal peace time complement of some 2300 trained employees may, therefore, have to be largely, if not wholly, displaced by those coming to the plant during the war years if any large percentage of those entering military service return, demand employment and are held to have employment rights superior to the older employees.

Indeed the principle of absolute priority for the veteran, as contended for by the Director of Selective Service, if carried to its logical conclusion, means that if sufficient veterans return to man the plant all (assuming qualifications) must be employed and all non-veterans discharged. In other words, carried to a logical, but perhaps not altogether a reasonable conclusion, those persons employed during the war inflation era and later entering military service *may* now take over the operation of the plant and those of long years of service and training in the plant may be displaced.

It cannot be denied but that the Act in question has given the returning soldier some very well defined rights. If he has left a position other than a temporary one

and at the conclusion of his military service merits and receives an honorable, discharge, is still qualified to perform the duties of his former position and makes application for reemployment within the time provided, he is entitled under certain conditions to be reemployed. If his employer was a private employer it becomes the duty of the employer to restore such person to such position or one of like seniority, status and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so.

■ The pleaded and admitted facts clearly show that plaintiff's greatly expanded operations from 1939 on were due entirely to the immense demand for war materials and were in no sense due to any natural increase in volume of normal business. The vast inflation of business and the vast inflation in the number of employees during the war period can no more be said to be a permanent condition than war itself can be said to be permanent. Such conditions began at the plant on the advent of war and terminated at the close of war. While this period of expanded operations continued for several years, yet in the sense that we usually define permanency it cannot be said to be permanent; neither can those persons who were engaged during and by reason of this inflated period of business be said to be permanent employees in the absence of affirmative proof evidencing a contrary intention. Standard dictionaries define "permanency" as a thing that is lasting, that which is not temporary. The same authorities define "temporary" as "transient or passing—not permanent; existing or continuing for a limited time only." It could not reasonably have been within the contemplation of either employer or employee (unless it be an exceptional case) that those who came to the plant on account of increased war production would long remain after the demands of war had been met. Many, no doubt, were moved by patriotic motives to be of service to their country in its time of need—some may have been moved by the desire to avoid military service—but whatever the motive, the fact remains that they were there to meet an immediate and urgent demand that all fervently hoped would be of short duration. Defendant Hinderhan having been accepted as an employee at a time when expanded operations demanded it, advanced in a short period to the position of caster, and after working 8 months as a caster left for military service. I am, therefore, constrained to hold that Hinderhan is not one who comes under the provisions of Section 8(b) of the Act for the reason that the position he held as caster at the time of his induction into military service was but a temporary position.

■ I am also of the opinion that a proper interpretation of the Act does not require the advancement of Hinderhan beyond the seniority status he had attained at the time of his leaving the plant plus the time spent in military service. If I am in error in this interpretation, then in any event it would be unreasonable on account of the employer's changed circumstances to require it to advance Hinderhan to the displacement of Barnett. These two latter propositions will be discussed later in this memoranda.

Case No. 2, Slaten-Bonds.

Defendant Roy Slaten was employed by plaintiff on December 3, 1913, and was promoted to the position of Adjuster Supervisor (on trimmers only) in the metallic department on July 13, 1941. He held the latter position until May 31st, 1942, when he was promoted to foreman in the metallic department; but thereafter, on March 19, 1944, by reason of curtailment of plaintiff's operations, he was demoted to his former position of Adjuster Supervisor (on trimmers only). Defendant George D. Bonds was employed by plaintiff on March 10, 1942, and was promoted to the position of Adjuster Supervisor (on trimmers only) in the metallic department on November 15, 1942, which latter position he held until May 16, 1944, when he left to be inducted into the military service of the United States. Bonds was honorably discharged from the armed forces on October 5, 1945, received the certificate referred to in Section 8(a) of the Act, was qualified to perform the duties of Adjuster Supervisor (on trimmers only) and made application for reemployment with plaintiff within the time required by the Act.

During the years 1935 to 1939, inclusive, plaintiff did not employ at its plant any Adjuster Supervisors (on trimmers only) in the metallic department, but such position was thereafter created. As a result of the expansion of operations during the war period it employed a maximum of 9 adjuster supervisors (on trimmers only) in the metallic department; but as a result

of reduction in its operations following the war it now employs only one such adjuster supervisor in the metallic department, which position is presently filled by the said Roy Slaten, a person without military service in the second World War. By reason of the provisions of the Selective Training and Service Act, defendant Bonds claims to be entitled to be restored to the position of Adjuster Supervisor (on trimmers only) in the metallic department, regardless of his length of service seniority in the plant, and even though his re-employment displaces the said Roy Slaten who has many years greater seniority of service in the plant, and also greater seniority in the position of Adjuster Supervisor, aforesaid.

Defendant Slaten contends that under the collective bargaining agreement hereinbefore referred to, he is entitled to retain the position of Adjuster Supervisor (on trimmers only), metallic department, in lieu of and instead of the defendant Bonds and notwithstanding the provisions of the Selective Training and Service Act.

The slight variation in facts between this case and Case No. 1 is of no importance in the consideration of the questions involved and all that has been said in the discussion under Case No. 1 is equally applicable to Case No. 2 and the conclusion will be the same.

### Case No. 3, Collins-Calvey.

Defendant Leo Collins was employed by plaintiff on April 2, 1923, and was promoted to the position of Adjuster Supervisor (head turn) on July 26, 1942, and has ever since held such position. Defendant D. C. Calvey was employed by plaintiff on August 21, 1940, and was promoted to the position of adjuster supervisor (head turn) on September 6, 1942, which position he held until October 15, 1942, when he left to enter the military service of the United States. Calvey was honorably discharged from the armed forces on September 25, 1945, received the certificate referred to in Section 8 of the Act, was qualified to perform the duties of an adjuster supervisor (head turn) and made application for reemployment with plaintiff within the time required by the Act.

During the years 1935 to 1939, inclusive, plaintiff did not employ at its plant any adjuster supervisors (head turn); but as a result of the expansion of plaintiff's operations during World War II it employed a maximum of six such adjuster supervisors. Pursuant to a drastic reduction in operations since the close of the war, plaintiff now employs only one such adjuster supervisor, which position is presently filled by the said Leo Collins.

At the time Calvey made application for reinstatement, defendant Collins had the shortest length of service seniority of any adjuster supervisor (head turn) then employed by plaintiff who had not served in the military forces of the United States in World War II, and if plaintiff is required to reemploy Calvey as adjuster supervisor (head turn) it will be obliged to remove defendant Collins from such position. Defendant Calvey claims that under the provisions of the Selective Training and Service Act he is entitled to be restored to the position in question regardless of his length of service seniority in the plant. Defendant Collins asserts that under the provisions of the collective bargaining agreement, heretofore referred to he is entitled to retain the position in question, and this, in spite of the provisions of the Selective Training and Service Act.

This case is essentially the same as cases 1 and 2 and the conclusion will be the same.

### Case No. 4, Read-Coontz.

Defendant Walter Read was employed by plaintiff on October 24, 1928, and was promoted to the position of slitter foreman on December 1, 1940. Thereafter, on September 12, 1945, by reason of curtailment of plaintiff's operations, Read was demoted to the position of slitter sub-foreman. Defendant Claude H. Coontz was employed by plaintiff on April 9, 1929, and was promoted to the position of slitter sub-foreman on May 31st, 1942, a position in which defendant Coontz served under the supervision and direction of defendant Read until July 7, 1942, when Coontz left to enter the military service of the United States. Coontz was honorably discharged from the armed forces on July 23, 1945, received the certificate referred to in Section 8(a) of the Act, was qualified to perform the duties of a slitter sub-foreman, and made application for reemployment with plaintiff within the time required by the Act. At the time defendant Coontz made application for reinstatement as slitter sub-foreman, defendant Read had the shortest service seniority of any slitter sub-foreman then employed by plaintiff and who had not been in the military service during World War II, and if plaintiff

is required to reemploy Coontz as a slitter sub-foreman it will be necessary for it to remove defendant Read from such position. Defendant Coontz asserts that under the provisions of the Selective Training and Service Act he is entitled to be reemployed as such slitter sub-foreman regardless of his length of service seniority in plaintiff's plant and regardless of whom it might displace and regardless of the fact that he at one time was employed under the direction and supervision of defendant Read. Defendant Read asserts that under the provisions of the collective bargaining agreement herein referred to and by reason of the fact that Coontz was at one time employed as a slitter sub-foreman under his direct supervision and direction he, Read, is entitled to retain his position as slitter sub-foreman and this in spite of the provision of the Selective Training and Service Act.

This case in part presents different questions from those discussed in the first three cases, for the reason that both persons involved were permanent employees of plaintiff at the time defendant Coontz left to enter military service. On the undisputed facts, Coontz is entitled to be restored to the position of slitter sub-foreman or to a position of like seniority, status and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so. It, therefore, becomes pertinent to consider just what is meant by the language "a position of like seniority, status, and pay," and, secondly, whether under the circumstances here present it would be unreasonable to compel the employer to reinstate Coontz and discharge Read.

■ Can it be said to be reasonable from the standpoint of general morale in plaintiff's plant and from the standpoint of cooperative relations between employer and employee in a case where one employee has been trained and acquired his skill under the supervision and tutelage of another employee, to have the pupil return and oust the teacher for no inherent reason attributable to either—that is without the reason of unskillfulness or unfaithfulness on the part of the teacher or of greater skillfulness and greater faithfulness on the part of the pupil? To compel an employer now operating under a much curtailed production program in which it finds itself without sufficient jobs for all to thus violate his collective bargaining agreement with its employees and disrupt the general morale of its organization would seem to be on the whole quite unreasonable. It may be conceded of course that if the bargaining agreement clashes with the provisions of the Selective Service Act, then the former must yield, but I am not prepared to say that there is any conflict if the Act is reasonably construed. Coontz became a slitter sub-foreman at the height of the expanded operations of plaintiff and at a time when Read was his foreman. By reason of the drastic curtailment of operations at the close of the war Read was demoted to slitter sub-foreman and if Coontz had been still working at the plant at that time, he would under the collective bargaining agreement have been demoted to some position junior to a slitter sub-foreman. Can it be said that by reason of his military service he is now upon his return entitled to outrank Read or perhaps bring about Read's release altogether? I am not persuaded that Congress ever intended that military service was to be a means by which one workman was to gain an advantage over another workman, but rather that the status quo of a workman entering military service was to be maintained and that he be not penalized by reason of such military service.

■ The principle of seniority among workmen in industrial plants has long been the cornerstone of harmonious relations between employer and employee and today has become generally accepted by both capital and labor. We should not lightly attribute to Congress the intention of overthrowing and disrupting this relationship in the absence of language clearly evidencing such intent. The Act itself recognizes the principle. In Section 8(c) it is provided that a person who is restored to his position "shall be considered as having been on furlough or leave of absence during his period of active military service, shall be so restored without loss of seniority." It is now urged that he is to be restored not only "without loss of seniority" but with a distinct advance in seniority over those of long years of service in the plant. All parties agree that under the Act the veteran has accumulated seniority the same as if he had remained on his job and so far as actual seniority is concerned bears the same relative position to all other workmen who remained at their post. To hold that the veteran has also gained the right to advance over older employees far beyond his years of service, including his

period of military service, would be to give him an undue advantage over other workmen. While Congress has in numerous ways accorded the veteran benefits and advantages due to his military service they have on the whole been at the expense of a grateful people and not at the expense of a class—in this instance the older employees if the interpretation of the Director be adopted. To hold that Congress was intending by this Act to confer such an advantage on the service man, in my judgment, goes beyond the express provisions of the Act and would not be warranted under ordinary rules of construction. Congress by a later Act, World War II Servicemen's Readjustment Benefits (G. I. Bill of Rights), 38 U.S.C.A. § 693 et seq., conferred advantages on the serviceman far beyond the civilian. By the Selective Training and Service Act, however, they were undertaking to establish the machinery for a "fair and just system of selective compulsory military training and service" and to that end provided in Section 8 of the Act that no handicaps should be placed on one in his employer-employee relationship by reason of his leaving his employment for military service. His status quo with accumulated seniority was provided for and definitely preserved; he was to suffer no handicaps in his employment relation by reason of his military service; in short, he was to get his own job back if it was in existence—not to get the job of another with longer years of service. A different construction would most certainly create such an unrest and upheaval in industrial relations as would retard economic recovery and be of no lasting benefit to anyone, including the veteran. The argument goes that it was thus the intention of Congress to give the returning veteran an advantage over his former fellow workmen and that such advantage is no more than a just reward for a patriotic service nobly performed. Without minimizing the great respect and lasting obligation all are under to those who bore the brunt of military service, yet we are not to be carried away in this hour of triumph, and in our zeal to show our appreciation to the returning veteran perforce be led into a construction of the Act that holds such potentialities of chaos in industrial relations. Examples of injustice are referred to in the argument— the case of a veteran of the first World War, with 25 or 30 years of industrial service being replaced in his position by a Wac who worked in the plant four months and spent three months in military service. We need not go beyond the instant case for an example. Defendant Slaten now has more than 32 years service with plaintiff. After 28 years he was promoted to be an adjuster supervisor. Bonds was employed by the company in 1942 at the near peak of their war expansion and became an adjuster supervisor in 10 months; and later entered military service. His contention now is that upon his return he is entitled under the Act to oust Slaten from his job. Such a construction of the Act can in no sense be squared with ordinary justice and fair play and I cannot believe that Congress so intended. If Bonds had not entered military service and had remained at his post as an adjuster supervisor he would now by force of the curtailment of operations be without employment. Nine such supervisors were employed at the peak of operations and the company now employs but one. In the Congressional debates one of the sponsors of the bill said: "It seems to me we could not require a company to restore the employment of men who, if there had been no military service, might have been discharged during the year because of a necessary reduction of the company's force."

To summarize, I hold that in Case No. 1, Hinderhan's claim cannot be sustained for the reasons that:

1. The position he held at the time of entering military service was a temporary one.

2. He is not entitled to advance beyond the seniority status he would have attained had he not entered military service but remained at his job.

3. If he be held to have attained a socalled super-seniority status then it would be unreasonable in view of the employer's changed conditions to require him to reemploy Hinderhan to the displacement of Barnett.

I make the same holding in Cases No. 2 and No. 3 for the same reasons.

In Case No. 4 I hold that Coontz' claim cannot be sustained for the reasons that:

1. He is not entitled to advance beyond the seniority status he would have attained had he not entered military service but remained at his job.

2. It would be unreasonable in view of the employer's changed conditions and in

view of the further fact that Read held a supervisory position over Coontz, to require the employer to replace Read with Coontz.

In my conclusions I am without support of judicial precedents. So far as I am advised but one court has passed directly upon any of the questions here involved and that decision is contra. Fishgold v. Sullivan Dry Dock & Repair Corp., D.C.E.D.N.Y., 62 F.Supp. 25. In the case of Whirle v. Trailmobile Co., 64 F.Supp. 713, the District Court of the Southern District of Ohio, on December 13, 1945, in passing upon the seniority status of a returned veteran, used language (dictum) in which it attributes to Congress the intention of giving the returning veteran a super-seniority status for a period of one year. The Director of Selective Service, charged with the duty of administering the Act has said, "A returning veteran is entitled to reinstatement in his former position or one of like seniority, status and pay, even though such reinstatement necessitates the discharge of a nonveteran with a greater seniority." These expressions are all entitled to great respect, but I am unable to accept the reasoning of any of them. It should also be observed that the Director in the same Memorandum speaks as follows: "In the administration of the Act, the Selective Service System takes the position that the seniority of a person in the service accumulates during such service to *the same extent and in the same manner as if such person had remained in continuous employment."* (My emphasis). The two statements of the Director seem to be a bit incongruous. Three arbitration decisions, the one In re Timken Roller Bearing Co., 16 L.R.R. 158, another In re Sullivan Dry Dock & Repair Corp., 16 L.R.R. 583, and the third, In re Dow Chemical Co., 17 L.R.R. 646, have reached an opposite conclusion upon grounds that appear to me to be logical, reasonable and above all equitable and just. An analysis and discussion of the whole problem appears in the Yale Law Journal of March, 1945, at page 417, et seq., in which the writer concludes: "The policy of a special reemployment equity for veterans is incompatible with organized labor's interest in union and job security, with management's interest in minimizing dislocations through sound personnel practices, and with the general public interest in an orderly transition to a peace economy. Such a standard, moreover, seems to promise no compensating security even for the veteran." The writer takes the position that preferential reemployment benefits are not required by Section 8 of the Act and if they were they would probably conflict with other labor laws and subject employers to conflicting legal duties. Counsel for the War Labor Board and the Department of Labor have likewise taken the position that the Act confers no superseniority rights upon the veteran. One of the staff of the Research Institute of America in a recent book entitled "Labor Today and Tomorrow" sums up the super-seniority issue as follows: "As written by Congress, the reemployment law was intended to assure the veteran that he would get his own job back; as interpreted by Selective Service the veteran would be given someone else's job. The veteran would walk into the plant, and the worker who had been there years before would have to walk out. The result would be to put the burden of reemploying veterans on those least able to carry it, the individual workers—not government or industry. As the American Veterans of World War II expressed it, Selective Service would 'rob Peter to pay Paul.'"

The Court's jurisdiction of the subject matter under the Federal Declaratory Judgment Act is conceded. Jurisdiction of all the parties is conceded insofar as the named defendants are concerned, but the authority of the individual defendants in a representative capacity to bind others said to be similarly situated, is challenged. I am of the opinion that the scope of the decree should not extend beyond those named, as each employee has the right to have his case considered on its own merits. Similarity of facts among the various employees will, however, render a final decree controlling to a great extent.

Counsel may submit proposed findings of fact, conclusions of law and a decree.