## BRYAN v. GRIFFIN.
### No. 1042.

District Court, W. D. Kentucky, at Louisville.

Aug. 23, 1946.

David C. Walls, U. S. Atty., and Arnold J. Lemaire, Sp. Asst. U. S. Atty., both of Louisville, Ky., for plaintiff.

Henry J. Stites and Stites & Stites, all of Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

The United States Attorney for the Western District of Kentucky, in the name and on behalf of K. O. Bryan, files this action pursuant to Title 50 U.S.C.A.Appendix, § 308(e).

Findings of Fact.

The plaintiff K. O. Bryan, on October 23, 1942, accepted a position as a laborer in the employ of Griffin & Company, an employer. Bryan worked in that capacity until April 5, 1943, when he became an apprentice and on January 31, 1944, became a journeyman sheet metal worker. The place of Bryan's work, prior to January 31, 1944, was in defendant's plant located at 819 Fehr Avenue in Louisville. On or about this date, plaintiff was transferred to the new ship yards north of Jeffersonville, Indiana, on the Ohio River, where the Jeffersonville Boat & Machine Company, as the prime contractor, was engaged in the construction of LST vessels by contract with the United States Navy. Griffin & Company, as a sub-contractor under the Jeffersonville Boat & Machine Company, was engaged in fabricating, and installing heating and ventilating equipment in the landing craft.

(2) Bryan continued in this work from January 31, 1944, until December 6, 1944, when he was inducted into the Army through the Selective Service, and served until September 5, 1945, when he was honorably discharged. He applied to defendant October 1, 1945, to be restored to the position he had held at the time of his induction, or to a position of like seniority, status and pay, as provided by Section 308 (b) (B), Title 50 Appendix U.S.C.A.

(3) Bryan was again employed by Griffin & Company on January 7, 1946, and worked for a period of eleven days at the plant in Louisville and was paid at the then current wage being paid journeymen sheet metal workers. On January 18, 1946, he was given a notice of separation and disqualification. The reason assigned for Bryan's termination was "Unable to satisfactorily perform duties of Journeyman Sheet Metal Mechanic."

(4) Bryan applied to the District Attorney of the District and on January 15, 1946, this suit was filed by Bryan seeking restoration to his former position and judgment for the wages he would have received had he been restored.

(5) The defendant relies upon four propositions as a defense:

(a) Bryan's position at the time of his induction into the Armed Forces was not "a position other than a temporary position."

(b) Defendant's circumstances have so changed as to make it unreasonable to restore Bryan to that position.

(c) Plaintiff is incompetent as a mechanic.

(d) Defendant has no work Bryan as a mechanic is competent to do.

(6) When Bryan applied to defendant to be restored to his position, he was advised that he could and would be employed as an apprentice at a wage of $1 per hour. This was due to Bryan's alleged inability to read blueprints and to plan and lay out work. The short period he had worked as an apprentice was insufficient for him to acquire this knowledge and skill. During the time he worked as a journeyman mechanic, he did routine work similar to "line work."

(7) When Bryan's application to be reinstated was made, he was offered a position as an apprentice, but was told by George Weining, Business Agent for Sheet Metal Workers' Union 110, that Bryan could not go back to work as an apprentice. In January 1943, when Bryan was issued a card of membership in the Union rating him as a sheet metal worker, he paid $62.50 to the Union. This was one-half the regular and usual fee paid by the sheet metal workers, and about the time Bryan and other·holders of the cards for which they paid $62.50 were sent to the Naval Yard at Jeffersonville, there was displayed on the Bulletin Board of Griffin & Company, and signed by George Weining, William J. Griffin and Raymond Heil (the latter being Erection Superintendent for Griffin & Company) the following notice:

"Notice

"All Men Louisville Shop Effective January 17, 1944, Eight A.M.

"The scale for journeymen mechanics will be One Dollar Forty Two and One Half Cents ($1.42½) per hour for all work in Louisville shop, as per construction agreement.

"Navy yard scale will prevail for all mechanics holding a shipyard card until such time as the War Labor Board approves an increase or change in the rate. Holders of shipyard cards in Louisville shop will be transferred to Jeffersonville yard within the next ten days."

Mr. Weining thus explains why the so-called "holders of Ship Yard Cards" were regarded as a separate class—

"Now in order to get men or manpower on that job to prosecute that portion of the war effort, we agree that the local unions would reduce the initiation fee, since the wage rate was below the construction rate, to promote the war effort, to relieve that some by cutting down the initiation fee to half of what our other workers had been accepted for. In order to do that, we made it known that those men would be accepted for $62.50 and that they would work on that shipyard at that time. There wasn't any discrimination, no notation made, or anything filed in the records that says his card was different from anybody's else's; but in order to maintain a sufficient number of men on that job, I, myself, assumed the obligation of saying, 'You bought a shipyard card and you are going to work on that shipyard,' because if it got out that they could use those cards on any other job, they would run off that job like rats off of a sinking ship and get on the other jobs of which there was plenty of at the time, and I was having trouble manning those jobs. And, knowing that the LST vessels were the most important thing for the war effort at that time, we set about that means to maintain that production of the LST Program. Since then these very same men who have that $62.50 cards are working in my contract shops, and various numbers of them are employed today by the various construction people who have contracts with me at this time."

(8) The Union, the employees of Griffin & Company holding "Ship Yard Cards" and Griffin & Company recognized that the issuance of the Navy Yard Cards was an emergency measure to meet the extreme shortage of sheet metal workers, which prevailed in the vicinity of Louisville in January 1944.

(9) At the time Bryan was employed by Griffin & Company, the latter had at its shops in Louisville approximately forty employees. Their number grew and during the summer of 1944, the defendant was maintaining a mechanical personnel of approximately nine hundred men, to maintain which a total of approximately seventeen hundred mechanics passed through the employment records of defendant and his predecessor corporation.

In June 1945, when the LST Program was cancelled and discontinued, the defend-

ant's mechanical personnel declined to approximately its pre-war number, and its activities were continued only at his work shop on Fehr Avenue in Louisville.

### Conclusions of Law.

(1) Jurisdiction of this action is vested in this Court by Title 50 U.S.C.A.Appendix, § 308 (e).

(2) The position held by Bryan at the time of his induction under the Selective Service Act on December 5, 1944, was not "a position other than a temporary position."

The facts in the case at bar are similar to those in the case of Olin Industries v. Barnett, D.C.S.D.Ill., 64 F.Supp. 722, 726. In that case, the company's average peacetime personnel of workmen numbered 2,333, but during the war effort, it maintained approximately 11,926. Eugene Hinderhan was employed by Olin Industries on May 27, 1942, and promoted to caster on January 18, 1944. He was inducted into the Armed Service September 18, 1942, and discharged on October 3, 1945, and seasonably made application to be reinstated as provided by the Act. The Court there said:

"The pleaded and admitted facts clearly show that plaintiff's greatly expanded operations from 1939 on were due entirely to the immense demand for war materials and were in no sense due to any natural increase in volume of normal business. The vast inflation * * * in the number of employees during the war period can no more be said to be a permanent condition than war itself can be said to be permanent. Such conditions began at the plant on the advent of war and terminated at the close of war. While this period of expanded operations continued for several years, yet in the sense that we usually define permanency it cannot be said to be permanent; neither can those persons who were engaged during and by reason of this inflated period of business be said to be permanent employees in the absence of affirmative proof evidencing a contrary intention. Standard dictionaries define 'permanency' as a thing that is lasting, that which is not temporary. The same authorities define 'temporary' as 'transient or passing—not permanent; existing or continuing or a limited time only.' It could not reasonably have been within the contemplation of either employer or employee (unless it be an exceptional case) that those who came to the plant on account of increased war production would long remain after the demands of war had been met. Many, no doubt, were moved by patriotic motives to be of service to their country in its time of need—some may have been moved by the desire to avoid military service—but whatever the motive, the fact remains that they were there to meet an immediate and urgent demand that all fervently hoped would be of short duration. Defendant Hinderhan having been accepted as an employee at a time when expanded operations demanded it, advanced in a short period to the position of caster, and after working 8 months as a caster, left for military service. I am, therefore, constrained to hold that Hinderhan is not one who comes under the provisions of Section 8 (b) of the Act for the reason that the position he held as caster at the time of his induction into military service was but a temporary position."

The Selective Training and Service Act does not by its terms define "a position other than a temporary position." Commenting upon this phase of the Statute, the Court in the case of Gualtieri v. Sperry Gyroscope Company, D.C.E.D.N.Y., 67 F. Supp. 219, said:

"There is no statutory definition of the term 'temporary position', for the very good reason that none was needed. The term should be interpreted in accordance with common usage, unless the Congressional intent was otherwise indicated. One must take judicial notice of an industrial condition which existed throughout the nation during the period immediately preceding our entry into the war, and during the war years. Hordes of workers sought and obtained positions in war plants who, * * * had never been occupied therein. The lure of high wages, aside from any patriotic motive, was sufficient to induce great numbers of applicants to seek war plant employment * * * There was no sound ground for the belief by those who sought and obtained employment during the emer-

gency years, and who then were inducted into the armed forces, that the plants of the (employer) were on a permanent basis, nor that their jobs were on a permanent basis. The same question was well considered in Olin Industries, Inc. v. Barnett, et al., D.C. 64 F.Supp. 722. There the court had no difficulty in interpreting the term 'temporary' and concluded that those who began working for the employer in the war years, in a company whose operations were greatly expanded after 1939, due entirely to extraordinary demands for war materials, held only 'temporary' positions."

█ Applying the reasoning in the Gualtieri case to the case at bar, it is not logical to conclude that Bryan believed that his position with Griffin & Company as a sheet metal worker was intended as a permanent position. The circumstances surrounding his payment of one-half the usual fee required for a journey-man sheet metal worker's union card; the fact that he and other holders of such cards were regarded and referred to as "Naval Yard Mechanics"; the character of the work that he was engaged in doing, all indicate that it was war emergency work which would abate with the cessation of hostilities.

(3) Unless Bryan, at the time of his induction into the Armed Forces, held "a position other than a temporary position" in the employ of Griffin, then there was no legal obligation upon Griffin under the terms of the Act to restore Bryan to the position he had held or to a position of like seniority, status and pay.

█ (4) The requirement of subsection (b) that a former employee, after the completion of his training and service, should receive a certificate and that he possess the qualifications to perform the duties of his former position, and that he make application for reemployment within forty days after being relieved from service, are conditions which the former employee must meet. Paragraph (B) of subsection (b) relieves the former employer if the employer's circumstances have so changed as to make it impossible or unreasonable to require him to restore the former employee. But the obligation on the part of the employer is confined to instances only in which the veteran at the time of induction had "position other than a temporary position." Where this condition does not prevail, the qualifications of the veteran and the changed or unchanged condition of the employer cease to be important. Bryan's position with Griffin & Company being temporary, there was no obligation upon Griffin to restore him, and in my view of the facts in this case, qualification or lack of qualification on the part of Bryan becomes immaterial.

█ (5) Counsel for plaintiff contends that Griffin is estopped to rely upon the temporary character of Bryan's employment or his lack of qualification, by reason of the fact that on January 7, 1946, Griffin did restore for a period of two weeks Bryan as a journeyman sheet metal mechanic.

Counsel relies upon the case of Niemiec v. Seattle Ranier Baseball Club, Inc., D.C. W.D.Wash., 67 F.Supp. 705. That case involved the rights of a baseball player who was inducted into the Service and discharged January 5, 1946, and reemployed by contract dated February 11, 1946, and whose employment was terminated April 21, 1946. The Court in the course of the opinion does say that Niemiec was reemployed "which was an estoppel against the respondent to deny his fitness." That doctrine is not applicable to this case, because Niemiec's position with the Baseball Club was not "a position other than a temporary one."

Judgment will be entered in this case dismissing plaintiff's petition.