No. 15,881.

WOOLDRIDGE ET AL. *v.* DENVER AND RIO GRANDE WESTERN
RAILROAD COMPANY ET AL.

(191 P. [2d] 882)

Decided March 22, 1948.   Rehearing denied April 12, 1948.

Messrs. COIT & GRAHAM, for plaintiffs in error.

Mr. T. R. WOODROW, Mr. H. M. BOYLE, for the railroad
company, defendant in error.

Mr. ALDEN T. HILL, Mr. HAROLD C. HEISS, Mr. RUSSELL B. DAY, for defendants in error other than the railroad company.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

OFFICIALS of the Brotherhood of Locomotive Firemen and Enginemen, as bargaining agent, requested the trustees of the Denver and Rio Grande Western Railroad Company to enter into a contract with that union, giving certain locomotive firemen on a portion of the narrow-gauge lines of the company limited seniority rights on a portion of the standard-gauge lines. Some of the locomotive firemen, mostly members of the same brotherhood union, on the affected portion of the standard-gauge lines threatened court action against the employing railroad company, hereinafter designated as the "carrier," if it entered into the proposed contract. Thereupon the trustees of the carrier—for whom have since been substituted the new reorganized company and its present officers—brought this action for a declaratory judgment, asking that the rights of each party under the proposed contract be defined and the status of each be fixed and determined. After a trial to the court, the latter, after first finding that the dispute was justiciable and that it had jurisdiction, entered judgment adverse to the standard-gauge firemen and authorized the carrier to enter into the proposed contract with the railroad brotherhood. The standard-gauge firemen come here seeking reversal of the judgment.

The controversy arises out of the fact that the Denver and Rio Grande Western Railroad was originally constructed as a narrow-gauge line and, as such, during the eighteen-eighties, its main east and west line between Pueblo and Grand Junction included that section from

Salida over Marshall Pass through Gunnison, Montrose and Delta. In the last decade of the nineteenth century the present standard-gauge line was completed which, as constructed west from Pueblo, diverged at Salida from the line of the earlier narrow-gauge and followed the course of the Arkansas river north to Tennessee Pass, then down the valleys of the Eagle and the Colorado rivers through Minturn and Glenwood Springs to Grand Junction. In the twentieth century, diversion of through traffic over standard-gauge lines and the competition of truck and auto for local traffic have operated to bring about steadily diminishing returns from the narrow-gauge portions of the railroad. This has resulted in the abandonment of considerable narrow-gauge mileage and the operation of the remaining narrow-gauge on greatly reduced schedules. In the nineteen-thirties the original narrow-gauge line from Salida to Grand Junction was itself in the latter category. It was represented by seniority district No. 13 from Salida to Gunnison, No. 14 from Gunnison to Montrose (including the Crested Butte and Ouray branches), and No. 16 from Montrose to Grand Junction. Another narrow-gauge line leaving Salida—in a similar class of reduced operations and earnings—was Seniority District No. 15 via Mears Junction to Alamosa, in the San Luis Valley. The employment of some of the men in these districts by the carrier became so seasonal that there were long intervals of unemployment, with the result that their railroad earnings alone would not afford them a living.

This situation became the matter of negotiation between the carrier and the brotherhood, and resulted in a contract dated July 31, 1936, under which the narrow-gauge firemen, who might wish to work on the corresponding portions of the standard-gauge line, obtained a priority rating as of August 1, 1936. Thus priority districts No. 13, Salida to Gunnison, and No. 16, Salida to Alamosa, were given an August 1, 1936, standard-gauge priority on district No. 3, Salida to Minturn; whereas

priority districts No. 14, Gunnison to Montrose (including the branches: Gunnison to Crested Butte and Montrose to Ouray), and No. 16, Montrose to Grand Junction, were given the same priority date, August 1, 1936, on standard-gauge priority district No. 4 extending from Minturn to Grand Junction. This afforded the narrow-gauge men work on the standard-gauge lines, when employment on the narrow-gauge lines became slack, but left it incumbent upon the narrow-gauge men to respond to calls to work on the narrow-gauge if they wished to protect their narrow-gauge priorities which were of considerably earlier date than their 1936 standard-gauge priority.

The contract of July 31, 1936, continued in force until April 1, 1945. It will be observed that it did not give the narrow-gauge employees priority over any standard-gauge men then employed. It simply gave the narrow-gauge men a priority status in respect to any firemen who might be employed on the standard-gauge portion of the line subsequent to August 1, 1936.

Apparently, however, the subsequently employed broad-gauge firemen disliked being junior in priority to the intermittently employed narrow-gauge men, and agitation grew for the cancellation of the contract.

The records of the proceedings of the Brotherhood, introduced in evidence, show that even as early as 1938 objection had been made to the legality of the 1936 agreement and that the president of the brotherhood had rendered a decision under date of March 8, 1938, that:

"The settlement dated July 31, 1936, does not constitute a consolidation nor a division of the seniority districts involved, and therefore it is not a violation of Article 14, Section 16, Paragraph (e) of the constitution. It does not constitute a transfer of firemen from one seniority district to another, and therefore does not in any way violate the provisions of Article 35, Denver & Rio Grande Western enginemen's agreement.

"The settlement in no way affects the seniority districts as prescribed in that part of Article 69, Denver & Rio Grande Western enginemen's agreement, and therefore it is in accord with Article 69 of the agreement.

"In view of the facts set forth above, decision is hereby rendered denying the appeal and sustaining the action of the general grievance committee."

The minutes of the meeting of the general grievance committee held March 12, 1942, show that on motion to terminate the agreement of August 1, 1936, members voted two for and ten against.

Minutes of the general grievance committee meeting held August 23, 1943, disclose that a motion to cancel the 1936 agreement was voted four yes and six no. The general grievance committee meeting held January 16, 1945, by a vote of nine to three rejected the recommendation of the executive committee to continue the 1936 agreement. Chairman Chipman of the general grievance committee, in accordance with the rules of his organization, thereupon notified the employing carrier of the action of his committee and served upon it a thirty-day notice of termination of the agreement. This was in accordance with a provision in the 1936 agreement that, the "foregoing agreement shall continue in effect until January 1, 1937 and remain in effect thereafter until the expiration of thirty days notice in writing served by one of the parties hereto upon the other." Through subsequent arrangement between the railroad and the brotherhood, the effective date of cancellation of the agreement was deferred until April 1, 1945.

None of the parties to the litigation contends that the 1936 agreement was terminated illegally. On the contrary, all admit that legal termination of the agreement was effected in accordance with the terms of the agreement itself, and that the method of termination conforms to the rules and regulations of the brotherhood which named the chairman of the general grievance committee as the legal representative of the bargaining

agent with full power to represent the brotherhood in dealings on matters of seniority with the carrier.

After the termination of the 1936 contract the following events occurred which were the immediate reasons for the bringing of this action. An appeal was promptly taken by two narrow-gauge firemen, representing respectively their lodges at Grand Junction and Salida, to the president of the brotherhood in accordance with the rules governing appeals.

The president in his decision, after carefully reviewing and commenting upon all of the pertinent facts, including a reference to his earlier ruling of 1938, concluded as follows:

"While I appreciate that Item 10 of the Agreement of July 31, 1936, provides for procedure for terminating such agreement, I have, nevertheless, reached the conclusion that the general grievance committee was not justified in taking the action it took on January 16, 1945, particularly since such action in no way whatsoever protects the seniority rights acquired by some sixty Narrow Gauge firemen on the Main Line, effective August 1, 1936, about thirty of whom were exercising this seniority on March 28, 1945, the date on which the carrier cancelled the agreement of July 31, 1936.

"In view of the foregoing, it is, therefore, my decision that the appeals of Brothers Scott and Wright are hereby sustained and action of the grievance committee set aside. Compliance with this decision requires restoration of the agreement of July 31, 1936, as soon as possible."

This decision of the president, dated May 3, 1945, was, on appeal, subsequently unanimously approved by the board of directors at Cleveland; notification of this final action of the brotherhood was made under date of August 16, 1946.

Following the action of the board of directors, the general chairman of the general grievance committee of the brotherhood again entered into negotiations with the

carrier looking toward a restoration of the 1936 agreement. The general grievance committee definitely requested the carrier to reinstate the agreement; whereupon, certain of the standard-gauge firemen notified the carrier that they would present claims against it for loss of wages in the event the narrow-gauge men, by any new contract, should be granted the right to work on subdivisions 3 and 4 with seniorities superior to the rights of the complaining standard-gauge men. This suit for a declaratory judgment was brought shortly afterward (July 23, 1945). At the trial, which began August 28, 1946, evidence was introduced showing that since the termination of the 1936 agreement, as of April 1, 1945, twenty-seven new firemen have entered the employment of the carrier on standard-gauge priority divisions Nos. 3 and 4. Evidence also showed that at that time slides had occurred on that portion of the narrow-gauge line between Gunnison and Montrose, completely blocking the line in several places, with the result that no through trains were being operated on the narrow-gauge line between Salida and Grand Junction. It further appeared that the line from Grand Junction to Montrose had been converted to standard-gauge by the laying down of a third rail before the end of the century —thus obviating the need of transshipping at Grand Junction the freight from Montrose and Delta districts; that all railroad traffic to and from Gunnison was being handled over the narrow-gauge from Salida.

At the conclusion of the trial the court made findings of fact and entered declaratory judgment December 2, 1946. The findings, in addition to setting forth the basic facts just detailed, included the finding that the general grievance committee of the brotherhood requested plaintiffs to restore the agreement of July 31, 1936, but no request was made that such agreement, if restored, should be retroactive in effect; that the plaintiff carrier contended that it had no legal right to enter into a new agreement which would grant the narrow-gauge fire-

men seniority rights on standard-gauge subdivisions 3 and 4 with a seniority date of August 1, 1936, which would be prior and senior to the seniority rights of the standard-gauge firemen who had been employed on those subdivisions since August 1, 1936.

Briefly, the court's conclusions of law were: 1. The court had jurisdiction.

2. That the agreement of July 31, 1936, was lawfully terminated as of April 1, 1945. (It is to be observed that this second finding is agreed to by the litigants. We can not refrain from noting that the need for court action might have been obviated had there been a rule or custom that termination of such an agreement should not become final until all possibility of appeal from the action of the chairman of the General Grievance Committee to the president and directors of the brotherhood had been barred.)

3. That the Brotherhood of Locomotive Firemen and Enginemen is the lawfully designated and acting representative of all firemen employed by the carrier.

4. That defendant, A. J. Chipman, as general chairman of the general grievance committee of the brotherhood had, and now has, lawful authority under the provisions of the National Railway Labor Act, and constitution of the brotherhood and by-laws of its general grievance committee, to continue negotiations heretofore commenced respecting the rights of the narrow-gauge firemen to work on standard-gauge subdivisions 3 and 4, and to enter into an agreement binding on all of the individual defendants respecting the establishment of seniority rights and fixing the date thereof as to any and all of the defendants.

5. That no consolidation of seniority districts is involved in the agreement above proposed, and that therefore such an agreement, if entered into, may lawfully be effective without submitting it to the employees on the standard-gauge subdivisions for their approval.

6. That under the authority granted by the president

and board of directors of the brotherhood by their decisions rendered on appeal, the general chairman of the general grievance committee has the right to enter into a contract respecting the matters above stated without submitting it to the general grievance committee for further approval or to the individual defendants in this case, or to the firemen employed subsequent to February 16, 1945, for their approval or ratification by majority vote.

7. The record contains no evidence of arbitrary, fraudulent or illegal acts, or other acts in excess of the powers of the officers or tribunals of the brotherhood, or acts contrary to its constitution.

The trial court, in its judgment, declared that the agreement of July 31, 1936 was lawfully cancelled as of April 1, 1945, and that the carrier was not liable to any of the narrow-gauge men for loss of wages which had been, or might be, sustained by reason of the cancellation; that the carrier was not liable to any of the standard-gauge men by reason of any loss of wages claimed to have been sustained by them between February 16, 1945 and April 1, 1945 by reason of any delay on the part of the carrier in putting into effect the cancellation of the 1936 agreement; that the railroad and the general chairman of the grievance committee of the brotherhood have lawful power to negotiate a new agreement restoring and placing in effect the substance of the agreement of July 31, 1936, whereby the narrow-gauge firemen are restored to work on the standard-gauge seniority subdivisions 3 and 4 with the seniority date of August 1, 1936; that the carrier shall not be liable to any of the broad-gauge firemen working on the standard-gauge subdivisions 3 and 4, having a seniority date subsequent to August 1, 1936, for any loss of wages or damages suffered on account of putting into effect of any of the provisions of such agreement.

The specifications and cross-specifications and position of the parties hereto may be summarized and con-

solidated as follows: (1) Counsel for the carrier, without taking a position on the merits of the controversy between the broad-gauge and the narrow-gauge firemen, argue in their brief the one proposition, that the court has jurisdiction of this litigation. (2) The broad-gauge firemen agree that the court has jurisdiction, but argue that it rendered an erroneous decision on the merits of the case. (3) The prayer of the answer of the brotherhood officials is in the alternative, to wit: either that the action be dismissed, or that the trial court determine it has jurisdiction and, in the exercise of its discretion, that it grant a declaratory judgment. Naturally, therefore, in their brief in this court counsel approve the judgment of the trial court in so far as the merits of the case are concerned; but the major portion of their brief is concerned with the proposition that the trial court had no jurisdiction of the case and therefore should not have tried it.

1. The jurisdictional question is one that apparently has given rise to considerable litigation in other courts. The position of the standard-gauge men is that, all of the remedies and procedures on appeal within the brotherhood organization itself have been exhausted, and that their only recourse is court action. We have recently applied the doctrine, that all remedies within the organization must be exhausted before the courts will take jurisdiction, in an action involving an ecclesiastical organization. *Knauss v. Seventh-Day Adventist Ass'n*, 117 Colo. 540, 190 P. (2d) 590. The argument of counsel on behalf of the brotherhood, after admitting that all procedures on appeal within the organization have been exhausted, is that the general rule affecting a controversy within labor unions regarding seniority rights is that the civil courts will not take jurisdiction in the absence of allegation or evidence of fraud, oppression or bad faith. *Louisville & N. Ry. Co. v. Miller*, 219 Ind. 389, 38 N.E. (2d) 239, 142 A.L.R. 1050, and the accompanying extended annotations beginning at page 1055.

Great stress is also placed upon the recent case of *Brotherhood of Railroad Trainmen v. Texas & Pacific Ry.*, 159 F. (2d) 822, decided since the trial of the instant case. There, two railroad companies and the brotherhood amended an agreement as to the division of the work in a consolidated freight yard to be performed by the employees of the companies. The effect of the agreement was to reduce by ten per cent the number of jobs available to the Texas & Pacific trainmen. The basis of the decision in that case is that the carriers are under a statutory duty to negotiate with the brotherhood, and that therefore neither negotiation nor an agreement with them can make the carriers liable. We do not follow at this time the reasoning of that case, nor do we deem it applicable in this proceeding. There, the question was whether a railroad company could be required to negotiate an amendment of an already existing contract with the brotherhood, whereas in the instant case there is presented: first, the validity of the cancellation of the July 1936 contract; and second, the question as to whether the carrier is required to enter into a new agreement to restore the 1936 contract without rendering it liable to individual defendants for loss of wages resulting from such cancellation. The Texas-Pacific Railway case would seem to be somewhat in conflict with what we have stated was the purpose and scope of our declaratory judgment act, '35 C.S.A., chapter 93, sections 78 to 92, inclusive; also, see, R.C.P. Colo., Rule 57, and *Equitable Life Assurance Soc. v. Hemenover*, 100 Colo. 231, 67 P. (2d) 80. More recently in *Bennett's, Inc. v. Krogh*, 115 Colo. 18, 168 P. (2d) 554, 164 A.L.R. 1010, we held that the trial court, instead of dismissing a complaint asking for a declaratory judgment on the ground that the plaintiff was not entitled to the relief prayed for, should have entered a declaratory judgment, as prayed, even though the judgment disclosed that plaintiff was not entitled to any relief

under the contract which he had asked the court to interpret.

The recent case of *Johnson v. Interstate Transit Lines,* 163 F. (2d) 125, 172 A.L.R. 1242, where the refusal of the trial court, in the exercise of its discretion, to take jurisdiction was upheld, affords an example by way of contrast of why we believe the trial court in the instant case, also in the proper exercise of its discretion, did assume jurisdiction. In the annotation which follows that case in 172 A.L.R. 1247, the three cases of *Boucher v. Godfrey,* 119 Conn. 622, 178 Atl. 655; *Hess v. Trailer Co. of America,* 31 Ohio O. 566, 17 Ohio Supp. 39, and *Gaskill v. Roth,* 151 F. (2d) 366, are mentioned as holding that, an actual controversy having been shown to exist, the seniority rights of an employee might be determined by a declaratory judgment. Cases where an employer has been allowed to maintain such a suit include: *Oil Workers International Union v. Texoma Natural Gas Co.,* 146 F. (2d) 62, 324 U.S. 872; *Olin Industries v. Barnett,* 64 F. Supp. 722; *Lord Mfg. Co. v. Nemenz,* 65 F. Supp. 711.

In our own jurisdiction, *Capra v. Local Lodge No. 273,* 102 Colo. 63, 76 P. (2d) 738, was a suit in injunction to fix and enforce alleged seniority rights of members of the same brotherhood of railroad employees involved in the instant case, over a new division operated by the Denver and Rio Grande Western Railroad Company between Denver and Bond which had been created by reason of the construction of the Moffat Tunnel and the Dotsero Cutoff. The trial court, after taking jurisdiction of the proceeding, entered a judgment of dismissal. One of the questions involved was whether the new line was a branch or main line. We approved the finding of the trial judge, that the new line was not a branch, but constituted a main line. The general grievance committee of the brotherhood had previously so ruled and divided the employment of its members among the Denver, Pueblo and Salida lodges on a 4-4-3 basis, rather than giving all of the employment to members of

the Denver lodge who would have been entitled to it had Capra's contention, that the Denver to Bond line was a branch line, been upheld. In that case, as in the instant one, there was an appeal from the action of the general grievance committee to the president and, after his approval of the decision of the committee, there was likewise a further appeal to the board of directors of the brotherhood, sitting at Cleveland, Ohio, which, as in the instant case, upheld the action of the president. As we there pointed out, seniority is not an inherent natural or constitutional right and does not arise from mere employment independently of contract, but exists by virtue of the contract between the employer and the union inuring through the latter to the benefit of the members. It is not disputed that the brotherhood of locomotive firemen and enginemen was, under the National Railway Labor Act, the duly accredited agent for entering into a collective bargaining agreement with the employing railroad company. It also appears that any agreement reached by the brotherhood as a bargaining agent would apply to those employees in the classification of firemen and enginemen who were not members of the union, as well as to those who were.

The answer of the standard-gauge firemen charged the union officials with fraud and caprice. The trial court made a specific finding that no fraud or caprice had been shown by the evidence. Counsel in their briefs here apparently have dropped the charges of fraud and the question is not argued. Nevertheless, we are of the opinion that abandonment of the fraud charge in the argument here would not warrant a reversal of the action of the trial judge in wrongfully taking jurisdiction of the case, when the record shows that fraud was alleged in the pleadings and was one of the questions in issue in the trial court. It will also be noted that the Capra case, supra, pertained simply to a contest between the brotherhood and a certain dissatisfied group of its membership, the carrier not being involved.

2. We are also of the opinion that the trial court was correct in awarding judgment in favor of the brotherhood on the merits. The presumption is that the power of internal management given officials and tribunals of a labor organization has been exercised fairly in the absence of a showing of fraud. *Capra v. Local Lodge No. 273, supra.* As already noted, the trial court made a finding of no fraud, and that finding is not specified as error in the proceedings here. An examination of the record impresses us as indicating an attempt of the court to do justice to all. An answer to the argument of the standard-gauge men, that their division priorities are a property right which has now become vested in them by the cancellation of the 1936 agreement, is that to allow the narrow-gauge men to work on the standard-gauge divisions for nine years, on the basis of their having a 1936 dated priority, and then at the end of that time suddenly divest them of that priority by virtue of a vote in a committee where the standard-gauge men could poll a majority, savors more strongly of the impairment of the obligation of contract and the wiping out of a vested interest than the situation confronting the standard-gauge men. Certainly, at least there would appear to be an element of estoppel present in allowing the narrow-gauge men to work on the standard-gauge subdivisions for a period of nine years on the basis of their having a 1936 priority and then suddenly wiping out that priority.

It would further appear that if the standard-gauge men can, by a preponderance of a committee vote, wipe out by the cancellation of a contract the 1936 priority of the narrow-gauge men, by the same token the general grievance committee at some subsequent time can, by a new contract, wipe out the priority of the standard-gauge men. If the contention of the standard-gauge men is that they have a property right or vested interest, all the more strongly can it be urged that the narrow-gauge men have a vested property right under the 1936 con-

tract which had been in effective operation for nine years.

From the foregoing it is apparent that, in our opinion, the action of the trial court should be upheld. The judgment is affirmed.

MR. JUSTICE STONE and MR. JUSTICE LUXFORD not participating.