## GUALTIERI et al. v. SPERRY GYRO-SCOPE CO., Inc.

Civil Actions Nos. 1077–1079.

District Court, E. D. New York.

July 5, 1946.

Friedman, Marx & Handler, of New York City (K. Bertram Friedman, of New York City, of counsel), for petitioners.

Chadbourne, Wallace, Parke & Whiteside, of New York City (Leonard P. Moore and Edward R. Neaher, both of New York City, of counsel), for respondent.

GALSTON, District Judge.

At the trial on motion these actions were consolidated because the facts in general are similar and the same principles of law apply.

The actions are brought by the petitioners pursuant to Sec. 8, subdivision (e), of the Selective Training and Service Act of 1940, Sec. 308(e), Title 50, Appendix, U. S.C.A. Each petitioner seeks re-employment with the defendant and judgment against the defendant for loss of wages from the date of the alleged unlawful discharge to a date of restoration to the positions theretofore held by such petitioners or like positions.

The provisions of the Selective Training and Service Act of 1940 which are relevant to this matter are found in the margin.*

---

* "8 (b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer * * *

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; * * *

"8 (c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, * * * and shall not be discharged

The parties are essentially agreed in respect to pivotal facts. Gualtieri was hired by respondent as an electrician's helper on December 3, 1940. He was employed in the electrical maintenance department until his induction into the Army of the United States on August 8, 1943. At that time he held the position of second class electrician, and was paid at the rate of 85¢ an hour. Ward entered the defendant's employ as an electrician's helper on June 10, 1941 and served in the electrical maintenance department until his induction into the Army on September 24, 1943. At that time he held the position of second class electrician, and was paid at the rate of 85¢ an hour. Peterson also was employed as an electrician's helper. He entered service on July 7, 1942 and served therein until his induction into the Naval Reserve on August 20, 1943. At that time he held the position of third class electrician, and was paid at the rate of 85¢ an hour.

During the month of December, 1945, the petitioners were honorably discharged from the armed services of the United States.

It appears that during the period of petitioners' service in the armed forces, second class mechanics in the respondent's electrical maintenance department were reclassified and were designated as fourth year electricians. The rate of pay was $1 an hour, retroactive to January 15, 1943. The petitioners received notice of such change in employment status and payment representing the retroactive wage increases.

Gualtieri applied for re-employment on December 10, 1945. He was re-employed during the first week of January, 1946, in the position of fourth year electrician in the electrical maintenance department. The prevailing rate of wage then for such employee was $1.18 per hour. Ward applied and was re-employed on or about January 28, 1946, in the same classification at the same rate of pay. Peterson was re-employed on January 25, 1946, similarly classified, and received the same rate of pay.

On or about February 13, 1946, the petitioners were laid off by the respondent because of lack of work in the electrical maintenance department. It is important to note that such lay off was made by the respondent in what it deemed to be the requirements of the seniority provisions of the collective bargaining agreement between respondent and Local No. 3 of the International Brotherhood of Electrical Workers, A. F. L., entered into during May, 1943. That agreement among other matters provided that:

"A. Seniority shall be reckoned from the date of employment in the appropriate bargaining unit.

"B. The following factor shall be considered in the event of increase or decrease in the number of employees:

"1. Length of service;

"2. Knowledge and ability in performing the work involved."

To present a full picture of respondent's defense in support of the lay off of these petitioners, it becomes necessary to recite something concerning the history of the respondent in respect to the number of its employees, and the plants operated by the respondent, particularly during the period beginning January, 1940. As the result of war orders accepted by the respondent, it added to plant space various buildings in Brooklyn and in Nassau County. It is estimated that the expanded facilities totalled some four million square feet of space. At the same time in January, 1940, the number of persons employed by respondent was 3,345. That number was rapidly increased. A year later the respondent had 5,582 employees. In June, 1941, there were 7,563 employees and in July, 1942, 18,346. The high mark of employment was reached in July, 1943, when 32,072 were employed.

During this period, the number of electricians in the electrical maintenance department increased from about 100 in 1941 to about 230 at the highest.

The cessation of hostilities brought about a serious change in the employer's circumstances, for, as testified to by John B. Wil-

---

from such position without cause within one year after such restoration."
Sec. 308(a) and Sec. 308(b), Title 50, Ap-
pendix, U.S.C.A., as amended Dec. 8, 1944.

son, secretary and assistant treasurer of the respondent, cancellations of contracts followed. The respondent has closed all but three or four plants and seeks to reduce its available operational space to the area of one million square feet. It has vacated a number of buildings in Brooklyn. At Great Neck, it plans to confine its manufacturing facilities to about two-thirds of the floor space available there. In passing it may be noted that the other one-third has been taken over by the United Nations Organization. Not only in operational space, but in the number of employees, major reductions were carried into effect. In January, 1946, from the heretofore stated peak of some 32,000, the employees, at the time of the hearing, numbered only 9,382.

The primary question arising from the record in the case is whether petitioners were employed by the respondent on a temporary or permanent basis, for the veteran acquired rights of re-employment only if, on joining the armed forces, he had left a position "other than a temporary position." There is no statutory definition of the term "temporary position," for the very good reason that none was needed. The term should be interpreted in accordance with common usage, unless the Congressional intent was otherwise indicated. One must take judicial notice of an industrial condition which existed throughout the nation during the period immediately preceding our entry into the war, and during the war years. Hoards of workers sought and obtained positions in war plants, who, before the war emergency developed, had never been occupied therein. The lure of high wages, aside from any patriotic motive, was sufficient to induce great numbers of applicants to seek war plant employment. As is generally known, there was a movement of labor throughout the country to the great centers in which the war plants were located. The respondent, like many other companies engaged in the manufacturing industry, was in position to employ great numbers of these applicants. From a low in 1940 of some 3,000 employees, to a peak of 32,000 in 1943, it was not the pre-war average of production which controlled. Laborers who entered upon employment in war plants such as that of the respondent,

must have realized that once the war was over the need for maximum production would cease. There was no sound ground for the belief by those who sought and obtained employment during the emergency years, and who then were inducted into the armed forces, that the plants of the respondent were on a permanent basis, nor that their jobs were on a permanent basis. The same question was well considered in Olin Industries, Inc., v. Barnett et al., D.C., 64 F.Supp. 722. There the court had no difficulty in interpreting the term "temporary" and concluded that those who began working for the employer in the war years, in a company whose operations were greatly expanded after 1939, due entirely to extraordinary demands for war materials, hold only "temporary" positions. That is my conclusion in the matter here presented.

Nor was there available to these petitioners at the time of their lay off "a position of like seniority, status and pay". The service of fourth year electricians was solely in installation work, not production. Thus, though the respondent employed at the time of the trial approximately 300 persons classified as "electric assembly occupation," the workers in that occupation performed production work involving a knowledge and skill different from that of an electrical maintenance worker. Moreover, employees in the respondent's electrical assembly occupation are represented for collective bargaining not by the A. F. L. but by Local No. 450 of the United Electrical, Radio & Machine Workers of America— C. I. O.

So because the petitioners were employed in positions which were temporary within the meaning of the Selective Training and Service Act of 1940, it must be held that in the pending causes they are excluded from the benefits which they seek to enjoy under that act, and that respondent was within its rights in laying off petitioners within a year after their re-instatement because of the changing circumstances due to the termination of war production. Their position is in no sense made stronger by the greater seniority rights which the respondent recognized as accruing to other respondent employees such as Boberg, Wagner and Lambert.

222

The petitions will be dismissed.

With the filing of this opinion appropriate findings of fact and conclusions of law will also be filed.