Buddy Lloyd COX et al., Plaintiffs,

v.

INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, LOCAL 1273, et al.,
Defendants.

Civ. A. No. 69–H–886.

United States District Court,
S. D. Texas,
Houston Division.

May 26, 1972.

Anthony J. P. Farris, U. S. Atty., Wayne H. Paris, Asst. U. S. Atty., Houston, Tex., for plaintiffs.

Chris Dixie, Dixie, Wolf & Hall, Houston, Tex., for defendant Local 1273.

Robert Eikel, Eikel & Davey, Houston, Tex., for defendant stevedore companies.

## MEMORANDUM OPINION

CARL O. BUE, Jr., District Judge.

This is an action which was tried to the Court. Plaintiffs as veterans seek advancement in seniority as longshoremen and the recovery of back wages of which they were allegedly deprived as a result of the refusal of their alleged employers, International Longshoremen's Association, Local 1273 (Local 1273) and thirty stevedore companies, to grant credit for their time spent in the Armed Forces toward job seniority status pursuant to the Universal Military Training and Service Act, 50 U.S.C. App. § 459.

The facts necessary for decision are essentially undisputed. Plaintiff Cox began working periodically as a longshoreman through Local 1273 in 1963 while still in high school. After completion of his high school education in June of 1965, he continued to work intermittently as a longshore laborer until February 16, 1966, when he was inducted into the United States Army. On February 1, 1968, he returned to longshore work after having received an honorable discharge from the Armed Forces. Plaintiff Heaton similarly worked as a longshoreman through Local 1273 while completing his high school education and thereafter periodically until inducted into the United States Marine Corps on February 21, 1966. On June 24, 1968, he returned to perform a relatively nominal amount of longshore work while, anomalously, waiting for an honor-

able medical discharge from the Armed Forces. Plaintiff Palmer began longshore work through Local 1273 in 1964 and worked intermittently until inducted into the United States Marine Corps on March 8, 1966. Following receipt of an honorable discharge, he returned to longshore work on March 22, 1968. After returning to this civilian employment at the Houston waterfront, two of the plaintiffs, Cox and Palmer, worked 1,200 hours in a fiscal year and were advanced from an unclassified or probationary type status, generally referred to as Class D, to seniority status designated as Class D–1. However, seniority credit for time spent in military service was not granted to those two plaintiffs, as well as plaintiff Heaton, since they did not work 1,200 hours in the fiscal year prior to their induction pursuant to the union's hiring hall rules.[1] Although plaintiff Heaton remains in the suit as a party, it is apparent that the controlling circumstances on which the legal issues turn in this litigation are found only in the actions of Cox and Palmer.

In order to view in proper context the various contentions of the respective parties, it is important at this point to describe in some detail the system of allocation of work employed at the Port of Houston under which the stevedore companies employ longshoremen to load and unload vessels; it is also important to

---

1. The following chart indicates the total number of hours worked by each plaintiff as well as their seniority classification for each fiscal year (September 30 to October 1) from 1963 through 1970:

For the year ending 9–30–63:

| | | |
|---|---|---|
| Cox | 92.75 | hours—D |
| Heaton | 63.50 | hours—D |
| Palmer | –0– | hours—D |

For the year ending 9–30–64:

| | | |
|---|---|---|
| Cox | 264.51 | hours—D |
| Heaton | 2.50 | hours—D |
| Palmer | 430.50 | hours—D |

For the year ending 9–30–65:

| | | |
|---|---|---|
| Cox | 688.50 | hours—D |
| Heaton | 499.50 | hours—D |
| Palmer | 647.25 | hours—D |

For the year ending 9–30–66:

| | | |
|---|---|---|
| Cox | 714.50 | hours—D |
| Heaton | 646.75 | hours—D |
| Palmer | 708.00 | hours—D |

For the year ending 9–30–67:

| | | |
|---|---|---|
| Cox | –0– | hours—D |
| Heaton | –0– | hours—D |
| Palmer | 42.00 | hours—D |

For the year ending 9–30–68:

| | | |
|---|---|---|
| Cox | 1310.25 | hours—D–1 |
| Heaton | 295.50 | hours—D |
| Palmer | 1210.50 | hours—D–1 |

For the year ending 9–30–69:

| | | |
|---|---|---|
| Cox | 1217.00 | hours—C |
| Heaton | 31.00 | hours—D |
| Palmer | 1341.00 | hours—C |

For the year ending 9–30–70:

| | | |
|---|---|---|
| Cox | 832.00 | hours—C (includes compensation time) |
| Heaton | 3.00 | hours—D |
| Palmer | 1719.00 | hours—C |

underscore the role played by the longshore union in this work context at the times material to this lawsuit. It is undisputed that this system is basically unique in the industry, the Court being apprised that there is no precisely parallel procedure employed in any other major American port.

The available work involving the loading and unloading of vessels at the Port of Houston is divided equally between defendant union, Local 1273 and another longshore union, Local 872. Local 1273 has a collective bargaining agreement with a representative association of the thirty defendant stevedore companies. Pursuant to this agreement, Local 1273 operates an exclusive hiring hall for the referral of longshoremen to the various stevedore companies requiring longshore labor in the Port of Houston.

Substantially all stevedore work in this port is performed by longshoremen who are referred through one of the two local unions. These stevedore companies, which are in direct competition with one another, present orders for gangs to the unions as they need longshoremen to load or unload vessels. The need for gangs by a particular company fluctuates considerably during the work year. Although vessels are constantly arriving at and departing from the Port of Houston, a particular stevedore company may or may not have a contract or contracts to perform stevedoring services for the vessels actually in port at a given time. In order to simplify an otherwise unmanageable record keeping process, the local unions and stevedore companies maintain one central system for keeping the payroll and seniority records of longshoremen.

The seniority procedures employed by Local 1273 determine the selection of longshoremen for referral to the various stevedores. The guiding principle is that a longshoreman must work 1,200 hours in a given fiscal year in order to receive seniority credit for that year. If the longshoreman does not work the required 1,200 hours per year, he loses one seniority year as a penalty. These laborers are classified by the union in conformity with their years of seniority as follows:

| CLASS | YEARS OF EMPLOYMENT |
|---|---|
| Gold Star | 25 |
| AAA | 20 |
| AA | 15 |
| A | 10 |
| B | 5 |
| C | 2 |
| D-1 | 1 |
| D (unclassified or casual) | less than 1 |

The hiring hall procedure requires gang foremen, who are selected by the unions, to choose their work gangs from the men according to seniority down to and including the casuals or D classified men, all of whom are divided into their respective classes at the time of selection in the hiring hall. Under this system any particular D classified man or casual may or may not be offered employment on a given day. His chance of a job depends on the number of higher classified men present at the hiring hall, the number of gangs needed for the available work and the preference expressed by the gang foremen in selecting members of their work gangs from the longshoremen on hand.

It is essential to recognize that under this system of employment anyone can enter the hiring hall, position himself in the section for casuals in the hall and instantly be theoretically eligible for selection to work in a gang. No employment application need be made to the union or to the stevedore companies to work as a casual longshoreman. In the event a casual is selected for work by a gang foreman, he then reports to the stevedore company at shipside to work the particular vessel which the stevedore has contracted to load or unload. The stevedore company may reject at shipside, and thus refuse to employ, any man sent to work for them by the union where proper cause can be shown. Once accepted, the longshoreman then becomes the employee of that particular stevedore company for the duration of that particular job. Until a casual has worked 1,200 hours

in one classification year so as to earn and advance to a D–1 classification, he is in direct competition for selection to a gang with all other casuals, regardless of the number of hours under 1,200 previously worked. Since all longshoremen receive the same basic rate of compensation, the sole advantage in holding a higher classification is the seniority status which carries with it the preferential right to be selected more often to work the ships and thus to work more hours and earn more money.

The purpose of the 1,200 hour rule is obvious. It is to induce regular career longshoremen, those who rely primarily on longshore work as a means of making a living, to work more hours per year and thus to minimize the number of participating casual workers. The casuals whose attendance at the docks is much more sporadic than that of the career longshoremen have been afflicted to a much greater degree with problems of inefficiency, inexperience, injuries and instability in the work force. The general feeling is that if a man does not average three days of work per week, he is not a regularly employed longshoreman and, therefore, should be discouraged from longshore work. As a matter of interest, the impetus for this rule came not from the union or the stevedore companies, but from the United States Department of Labor which apparently took the view that decasualization of the industry was a necessity if chronic labor problems in the shipping industry were to be properly solved. Thus it was stated by the Department of Labor that the 1,200 hour rule "goes far toward establishing a stable work force in the port." [2]

Further, this governmental agency has stated that "[i]n this regard, the union has done well with the responsibility it carries for administering the hiring procedures." [3] As would be anticipated, the hiring hall rules dictate that an allowance for time spent in the military including that for advancement in seniority, is permissible only if the longshoreman in question has worked 1,200 hours in the year prior to induction.

Certain of the other casual longshoremen working through Local 1273 and accumulating comparable hours to plaintiffs during the period October 1, 1965, to September 30, 1967, were able to obtain the necessary 1,200 hours required for advancement to D–1 classification.[4] In 1968 plaintiffs Cox and Palmer were classified D–1 after having worked the required 1,200 hours, and in the same year 117 other men similarly worked the necessary hours to be so classified. However, of the 3,807 men who worked through Local 1273 that year, the vast majority or approximately 2,700 were class D or casuals. Their work patterns fell short of any consistent regular employment, ranging from four hours to 1,199 hours per year, and can best be characterized as intermittent, sporadic or irregular. Indeed, some were moonlighters, working at two or three jobs at the same time.

Plaintiffs contend that the 1,200 hour qualification period which must be met before a longshoreman is allowed credit for military service toward seniority standing is not compatible with the Universal Military Training Act. Specifically, it is asserted that had they not

2. Manpower Utilization—Job Security in the Longshore Industry—Ports of Houston-Galveston (U.S. Dept. of Labor, Sept. 1964) 36.

3. *Id.* at 41.

4. The total number of casuals attaining D–1 classification for fiscal years 1964 through 1971 was as follows:

| For Year Ending September 30 | Number of Men |
| --- | --- |
| 1964 | 60 |
| 1965 | 78 |
| 1966 | 120 |
| 1967 | 36 |
| 1968 | 119 |
| 1969 | 34 |
| 1970 | 34 |
| 1971 | 33 |

been called to military duty, they necessarily would have advanced to D–1 classification in either 1966 or 1967 with the result that they now are entitled to a higher seniority classification. Plaintiffs contend that defendant union and defendant stevedore companies are joint employers within the meaning of the Act and that the failure of these defendants to afford seniority rights to them has resulted in monetary damages. Such damages ostensibly arise as a consequence of plaintiffs being selected for work less frequently because of their occupying a lower seniority classification. Defendants, on the other hand, strenuously urge that plaintiffs, as casual longshoremen, were only temporary employees within the meaning of the Act at the time they were inducted into the Armed Forces and that, therefore, they were not eligible for its seniority advancement benefits. Alternatively, it is asserted by defendants that the hiring hall's 1,200 hour qualification period is not only compatible with the Act but also serves a justifiable business purpose which the Department of Labor both induced and subsequently approved.

██ For the purpose of providing job security to persons inducted into the Armed Forces, section 9(c) (1) of the Universal Military Training Act, 50 U.S.C. App. § 459(c) (1), provides that veterans returning from military service must be restored to their civilian employment without penalty including no loss of seniority status. The employment privileges and opportunities which were available to those who remained in civilian jobs while others entered military service were intended to be conferred upon returning veterans so that they would have equal opportunities to progress. Veterans were not to suffer employment disadvantages by reason of their having left civilian jobs to serve in the Armed Forces. However, this intention assumes that the veteran left a position with fixed employment rights vis-a-vis an employer which he could, but for his military service, normally be expected to hold for an indefinite period.

The Universal Military Training Act and the many cases which have subsequently construed to make it perfectly clear that veterans upon their return to civilian jobs are not entitled to greater rights or job prospects than they would have had if they had not entered military service. Tilton v. Missouri Pacific R. R. Co., 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964); McKinney v. Missouri-Kansas-Texas R. R. Co., 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958); Moe v. Eastern Air Lines, Inc., 246 F.2d 215 (5th Cir. 1957), cert. denied, 357 U.S. 936, 78 S.Ct. 1380, 2 L.Ed.2d 1550 (1958); Stewart v. American Airlines, Inc., 288 F.Supp. 160 (N.D.Tex.1968). This principle was succinctly expressed in Mc-Kinney v. Missouri-Kansas-Texas R. R. Co., *supra*, 357 U.S. at 271–272, 78 S.Ct. at 1226:

However, § 9(c) does not guarantee the returning serviceman a perfect reproduction of the civilian employment that might have been his if he had not been called to the colors. Much there is that might have flowed from experience, effort, or chance to which he cannot lay claim under the statute. Section 9(c) does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service. The statute manifests no purpose to give to the veteran a status that he could not have attained as of right, within the system of his employment, even if he had not been inducted into the Armed Forces but continued in his civilian employment.

Accordingly, the Act provides that anyone who held an "other than temporary position" prior to induction into the Armed Forces can sue to protect or establish his reemployment rights pursuant to this statutory provision.

In construing the Act it was early recognized that since the statute does not define the term "other than temporary position" it should be defined pursuant to common usage and given its ordinary meaning. Gualtieri v. Sperry Gyroscope Co., 67 F.Supp. 219 (E.D.N.Y. 1946); Bozar v. Central Pa. Quarry, Stripping & Constr. Co., 73 F.Supp. 803 (M.D.Pa.1947). The fact that the employment arrangement under scrutiny places the employee's position "at the will" of the employer does not transform the employment into a temporary position. Moe v. Eastern Air Lines, Inc., 246 F.2d 215 (5th Cir. 1957), cert. denied, 357 U.S. 936, 78 S.Ct. 1380, 2 L.Ed.2d 1550 (1958). In this connection it should be noted that the Act must be construed liberally to serve and implement its basic policies. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946). In ascertaining whether a position is temporary in a given employment situation, it is now well established that "the controlling determination is whether, regardless of the contract of employment, there was a reasonable expectation that the employment would be continuous and for an indefinite time." Moe v. Eastern Air Lines, Inc., *supra*, 246 F.2d at 219. *See* United States ex rel. and for Use and Benefit of Stanley v. Wimbish, 154 F.2d 773 (4th Cir. 1946); Brickner v. Johnson Motors, 425 F.2d 75 (7th Cir. 1970). The purpose of this requirement of "reasonable expectation" is to recognize that a temporary position, one which is held only briefly with no preferential right to employment, could very well be lost anyway, even though the person involved was not called to military service. Thus, a person occupying such an employment position could not be viewed as possessing a reasonable expectation of continued employment. Moe v. Eastern Air Lines, Inc., *supra*. Nevertheless, the statutory purpose must be borne in mind at all times so that an employer is not permitted by contract, contrivance or otherwise to remove a large segment of his employees from the scope of the Act and thus evade its basic policy. Dame v.

C. A. Batson Co., 157 F.Supp. 862 (D. Mass.1957). Applying the foregoing test of "reasonable expectation", it is only too apparent that plaintiffs did not occupy an "other than temporary position." As casual longshore laborers who worked only when the regular longshoremen could not fill all of the gangs needed, they could not reasonably expect that their employment would be continuous and for the indefinite future. The policy behind this "other than temporary" exception is consistent with this disposition, since plaintiffs as occupants of temporary positions clearly could have been deprived of their employment as casuals, even if they had not been called to military service.

Alternatively, even if this Court found that plaintiffs were permanent employees, they still would not be entitled to advancement in their seniority status in this instance. In Oakley v. Louisville & Nashville R. R. Co., 338 U.S. 278, 283, 70 S.Ct. 119, 122, 94 L.Ed. 87 (1949), it was aptly stated that:

> [A]n honorably discharged veteran, covered by the statute, [is] entitled by the Act to be restored not to a position which would be the precise equivalent of that which he had left when he joined the Armed Forces, but rather to a position which, on the moving escalator of terms and conditions affecting that particular employment, would be comparable to the position which he would have held if he had remained continuously in his civilian employment.

However, the application of this "escalator principle" requires satisfaction of a condition precedent in any given situation. In order to be entitled to advancement upon return from military service, the veteran must show with reasonable certainty that he would have enjoyed such advancement simply by virtue of continuous employment during his absence. Where advancement depends on the discretionary choice of the employer, a choice which was not exercised prior to departure, the veteran is not entitled to advancement upon his return from military service. McKinney v.

Missouri-Kansas-Texas R. R. Co., 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958). It is clear that:

> This requirement is met if, as a matter of foresight, it was reasonably certain that advancement would have occurred, and if, as a matter of hindsight, it did in fact occur.

Tilton v. Missouri Pacific R. R. Co., 376 U.S. 169, 181, 84 S.Ct. 595, 602, 11 L.Ed. 2d 590 (1964). A companion case to *Tilton* indicates that ordinary uncertainties of life cannot be used by an employer to defeat the reasonably certain requirement and thereby deny the veteran his seniority rights. Examples of such uncertainties include the following: the fact that the particular type of work involved might not be available upon the veteran's return; the fact that the veteran's work might have been unsatisfactory if he had remained in civilian employment; or the fact that illness might have prevented the veteran's continuous employment. Brooks v. Missouri Pacific R. R. Co., 376 U.S. 182, 84 S.Ct. 578, 11 L.Ed.2d 599 (1964). However, such ordinary uncertainties are not involved in the instant lawsuit.

The intent of Congress was to provide legislation which would prevent veterans from being penalized by reason of their absence from civilian employment; it was not Congress' intent to coerce or otherwise force employers to create positions for returning veterans simply because the veteran's civilian contemporaries or successors were so advanced. The Act requires only that a returning veteran be advanced in seniority to the extent that he would have been, as a matter of right, had he not been inducted into military service. The advancement or promotion is not a matter of right if such occurrences depend upon the successful completion of conditions precedent and thus upon the discretion of the employer or upon the merit of the employee in the particular employment involved. In short, the Act provides that returning veterans must be considered as if they had been on a leave of absence. Accordingly, if promotion or advancement depends upon qualifications other than mere length of service with the employer, then the returning veteran is not entitled to such advancement.[5]

The facts in this lawsuit make it perfectly clear that advancement from casual or D status employment to D-1 classification requires affirmative discretionary action of management. While it is true that, once a casual longshoreman accumulates 1,200 hours in a fiscal year, he is automatically entitled to a D-1 seniority classification, the attainment of 1,200 hours in a fiscal year is not simply a matter of continuous employment. The casuals or D classified men are not pre-selected, by application or otherwise, by management. The selection of casuals for any work at all is a result of a daily exercise of supervisory discretion performed by numerous gang foremen throughout the year. Fitness, ability, agility, strength, reliability, experience, acquaintanceship and even being related to another longshoreman are some of the factors commonly given consideration by gang foremen in choosing their gangs. This daily selection process serves to eliminate the vast majority of the casual laborers. Since there is a huge surplus of men for the available work in this industry, there is simply no reasonable certainty that

---

5. In sharp contrast with the facts involved in the present lawsuit in which broad affirmative discretion is exercised daily by the gang foremen in selecting personnel from a casual labor force for their respective gangs is a factual situation in which an employer exercises a discretion in the nature of a unilateral right to discharge some probationary employees. In Montgomery v. Southern Electric Steel Co., 410 F.2d 611 (5th Cir. 1969), the plaintiff-veteran was found to be entitled to retroactive seniority in employment in a steel rolling mill since it was concluded that the unilateral right of the employer to discharge employees who hold probationary type positions, even though exercised with some regularity to discharge ten percent of these employees, does not qualify as an affirmative discretionary factor accorded to management when applying promotion selection criteria to its personnel to preclude the veteran from satisfying the reasonable certainty requirement.

casuals as a group will attain seniority status. In fact, in 1968, the year plaintiffs Cox and Palmer obtained D–1 classification, only four percent of the casuals actually made this advancement.

 Despite the fact that these two plaintiffs ultimately attained seniority status, the evidence is clear that it was by no means a reasonable certainty. Indeed, to advance to a D–1 classification from an unclassified or D classification is obviously the exception and not the rule. Thus, the foresight requirement of the "foresight—hindsight" test of the *Tilton* case was not and could not be met under the circumstances of this case. The intent of the Act was to give to returning veterans only employment rights, including advancements and promotions, that they could reasonably anticipate at the time of their induction into military service. Viewing liberally the circumstances of this case involved in the specific, realistic reemployment context of the Houston waterfront, plaintiffs simply could not have reasonably anticipated attainment of seniority status. This Court assesses defendants' actions including the 1,200 hour qualification period rule for military allowance as being consistent with the dictates and underlining policy of the Act and, therefore, concludes that plaintiffs are not entitled to the relief requested.